BML Props. Ltd. v China Constr. Am., Inc. (2023 NY Slip Op 50505(U))

[*1]

BML Props. Ltd. v China Constr. Am., Inc.

2023 NY Slip Op 50505(U)

Decided on May 25, 2023

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 25, 2023
Supreme Court, New York County

BML Properties Ltd., Plaintiff,

against
China Construction America, Inc., NOW KNOW AS CCA CONSTRUCTION, INC., CCA CONSTRUCTION, INC., CSCEC BAHAMAS, LTD., CCA BAHAMAS LTD., DOES 1 THROUGH 10, Defendant.

Index No. 657550/2017

Plaintiffs by:
Ganfer Shore Leeds & Zauderer LLP, 360 Lexington Ave, New York, NY 10017
Glaser Weil Fink Howard Avchen & Shapiro LLP, 10250 Constellation Blvd, Los Angeles, CA 90067
Morrison Cohen LLP, 909 Third Ave, New York, NY 10022
Susman Godfrey, LLP, 1301 Avenue of the Americas, 32nd Floor, New York, NY 10019
Defendants by:
Squire Patton Boggs (US) LLP, 2550 M Street, NW, Washington, DC 20037; 127 Public Sq, Cleveland OH 44114

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 012) 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 577, 578, 579, 580, 581, 582, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 596, 597, 598, 599, 600, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 626, 627, 628, 629, 630, 631, 632, 633, 634, 635, 636 were read on this motion to/for SUMMARY JUDGMENT(AFTER JOINDER.
The following e-filed documents, listed by NYSCEF document number (Motion 013) 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, [*2]538, 539, 540, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557, 558, 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570, 571, 572, 573, 574, 575, 576, 637, 638, 639, 640, 641, 642, 643, 644, 645 were read on this motion to/for SUMMARY JUDGMENT(BEFORE JOIND).

Upon the foregoing documents and for the reasons set forth below, China Construction America Inc., now known as CCA Construction, Inc. (CCA), CSCEC (Bahamas), Ltd. (CSCEC)[FN1]
, and CCA Bahamas, Ltd.'s (CCAB; CCA, CSCEC, and together with CCAB, hereinafter, collectively, the Defendants) motion (Mtn. Seq. No. 012) for summary judgment is denied. Specifically, the court denies the Defendants' summary judgment motion to (i) dismiss BML Properties Ltd.'s (BMLP) claims for fraud because they arise out of the Investors Agreement (NYSCEF Doc. No. 582), (ii) limit any damages available to BMLP so as to preclude the recovery of lost profits, (iii) dismiss BMLP's claims for breach of the reporting duty in Section 4.7 of the Investors Agreement, (iv) alternatively, dismiss BLMP's reporting claims to the extent they are cognizable as fraud claims because BMLP did not actually or justifiably rely on any misstatements or omissions, (v) dismiss BMLP's claims as released as part of Baha Mar Ltd.'s (BML) winding-up proceedings in the Bahamas, (vi) dismiss BMLP's claims as derivative, (vii) dismiss BMLP's claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment as duplicative, and (viii) dismiss BMLP's claims for breach of the November 2014 Meeting Minutes (the Meeting Minutes) because BMLP is not a third party beneficiary of the Meeting Minutes. 
BMLP's motion (Mtn. Seq. No. 013) for summary judgment is granted with respect to dismissing (x) CSCEC's counterclaim for breach of contract as to Sections 4.7, 4.8(g), and 4.8(l) of the Investors Agreement, and (y) the Defendants' affirmative defenses that (i) the claims are subject to a Deed of Novation pursuant to which all rights and claims arising out of the MCC were transferred and discharged (NYSCEF Doc. No. 161, ¶ 6), (ii) the claims are subject to a Deed of Release pursuant to which all claims arising from contracts related to the Project were released (id., ¶ 7), (iii) BMLP lacks standing to assert derivative claims under the Investors Agreement (id., ¶ 9), (iv) BMLP failed to join a necessary party to this action (id., ¶ 10), (v) BMLP's claims were discharged by bankruptcy pursuant to wind-up proceedings in the Bahamas (id., ¶ 16), (vi) BMLP's claims are barred by the statute of limitations (id., ¶ 19), and (vii) BMLP's claims are subject to liquidated damages (id., ¶ 23). 
The underlying facts and circumstances of this case are set forth in the Decision and Order of the Court (Scarpulla, J.), dated January 24, 2019 (the Prior Decision; NYSCEF Doc. No. 154). Familiarity is presumed. Any term used but not otherwise defined shall have the meaning ascribed thereto in the Prior Decision.
Briefly, as relevant to the instant motions, on January 13, 2011, BMLP and the Defendants entered into the Investors Agreement, pursuant to which BMLP made an $830 million equity investment into the Project and received 100% of BML's voting shares. Pursuant to the Investors Agreement, BMLP was responsible for BML's day-to-day management, subject to the direction of the Board of BML. BML's Board was made up of five members, one nominated by CSCEC and the other four, including the chairman, nominated by BMLP. [*3]Pursuant to Section 4.2 of the Investors Agreement, CSCEC was entitled to appoint one member of the Board of BML, and pursuant to Section 4.7 of the Investors Agreement, CSCEC was entitled to appoint five representatives who would be seconded to the Project (collectively, the CSCEC Representatives). Pursuant to Section 4.7 of the Investors Agreement, the CSCEC Representatives were to have reasonable access to the books, records, communications, and other documents of the Project and BML's staff in order to monitor the Project's schedule, budget, and similar matters in the interest of BML. The board member appointed by CSCEC was also required to report to the Board of BML as to CSCEC's findings, concerns, and recommendations. The CSCEC Representatives were required to at all times act in the "best interests" of BML and were required to abide by certain confidentiality and conflicts-of-interest provisions (NYSCEF Doc. No. 582, § 4.7).
In the Prior Decision, the Court held, among other things, that the fraud claims were not duplicative of the breach of contract claims because (i) the fraud claims relied on misrepresentations of then-current facts regarding the Project, and (ii) the damages sought under the fraud claims were for mitigation expenses and investment efforts based on those misrepresentations, not the contract value (NYSCEF Doc. No. 154, at 21-22). The Appellate Division affirmed, holding that the alleged false statements concerning the Project's status and the workforce and resources available to meet deadlines were collateral to the contracts (NYSCEF Doc. No. 182, at 2). 
The Court also held that BMLP's claims are direct, not derivative claims, because BMLP alleged that CCA, the only other shareholder in BML, did not sustain a proportionate loss to that sustained by BMLP (NYSCEF Doc. No. 154, at 19). This too was affirmed on appeal.
Discovery has only served to underscore the wisdom of the Prior Decision. It is now clear that Taizhong "Tiger" Wu, one of the CSCEC Representatives and CCAB's Executive Vice President approved over 700 workers leaving the Project between December 2014 and February 2015 (i.e., in the final months leading up to the projected date for substantial completion (March 27, 2015) without approval from BMLP despite knowing that those workers may well have helped the Project reach the substantial completion date on time  which it did not (tr at 143, lines 15-25 and at 145, lines 9-19 [NYSCEF Doc. No. 594]). Mr. Wu did this after CCA sent a letter to CSCEC on January 21, 2015 stating that "the project has entered the critical stage of final full-scale shock work" and that "the production situation of the project tis extremely severe, and if the situation cannot be fundamentally reversed, it will cause irreparable and catastrophic losses" (NYSCEF Doc. No. 591). Indeed, CCA made clear that the joint venture partner needed to do the opposite of what Mr. Wu did:
We hereby sincerely implore the joint-stock company to strictly order all professional companies participating in the construction to take urgent measures immediately, quickly organize the dispatch of the additional labor force, and dispatch skilled workers and experienced management personnel to the site for the final shock work before the end of January, so as to ensure that the project's scheduled target of full opening on March 27, 2015 can be achieved. At present, it is imminent to increase the number of personnel in the project
(id.[emphasis added]). To put this in context — Sarkis Izmirlian, President of BMLP, witnessed CCA disingenuously (given the plan to divert workers and resources) tell the Prime Minister of the Bahamas and the Chinese Ambassador to the Bahamas that the Project would be finished by [*4]March 27, 2015 (tr at 26, lines 10-22 [NYSCEF Doc. No. 505]). 

Indeed, it is now clear that Mr. Wu sent workers away with the express purpose of causing CCA to stop work so that they could force BML and BMLP to negotiate funding (tr at 330, lines 4-19 [NYSCEF Doc. No. 594]). It is also clear on the fully developed record before the Court that CCA diverted resources and key personnel to other projects in which BML had no interest whatsoever. For example, according to David Liu, one of CCAB's vice presidents and a CSCEC Representative, while the Project was ongoing, CCAB acquired another resort near to the Project in which BML had no interest (tr at 17, 4-10 and at 52, lines 7-25 [NYSCEF Doc. No. 598]). Allen Manabat, the head scheduler for the Project could not update the schedule for the Project because he was engaged in his work on a project in Panama (NYSCEF Doc. No. 601). 
It is also clear that the Defendants were actively pursuing their own interests to the detriment of BML and BMLP. By letter dated March 18, 2015, Yuan Ning, President of CCA, wrote to Chen Guacai, Vice President of CSCEC that, to bring BMLP back to the negotiating table, CCA suggested "taking extreme measures such as a complete shutdown of the work" (NYSCEF Doc. No. 583). The next day, CCA instructed its personnel to freeze handing over rooms (NYSCEF Doc. No. 604). By email dated July 6, 2015, from Mr. Liu to, among others, Mr. Wu, Mr. Liu wrote: "[w]e should take advantage of the Bahamas government. If the government, Export-Import Bank of China and CCA join forces, we can turn passive into active!" (NYSCEF Doc. No. 585). Put another way, Mr. Liu saw an opportunity to fundamentally change the relationship between the joint venture partners and worked to cause this to occur. Indeed, at a meeting between the Defendants and the Export-Import Bank of China on September 28, 2015, the Defendants indicated that they should push for the Export-Import Bank of China to be named receiver of the Project so that, among other things, they could "protect the interests of China Construction's USD $150 million preferred stock" (NYSCEF Doc. No. 607). In other words, the fully developed record now indicates that the Defendants actively sought to remove BMLP from the Project so that they could protect their own investments and to the detriment of the joint venture partner. As is clear, they were successful as this is exactly what occurred.
BMLP alleges that the actions of the CSCEC Representatives and the Defendants resulted in delays to the Project and missed deadlines. The MCC initially contemplated a December 2014 substantial completion date. When it became apparent that the December 2014 date would not be met, the parties met in November 2014 in Beijing, China, and agreed that, by March 27, 2015, (i) the Project would be substantially completed, and (ii) the resort would be opened to guests. When the March 27, 2015 opening date was missed, BML allegedly lost money from, among other things, (i) booked reservations that could not be kept, (ii) spending money to stock the resort and hire staff. 
As a result of the missed deadline, when the Board of BML met on June 29, 2015, the Board (significantly, other than Mr. Izmirlian and Mr. Wu, the representatives of BMLP and the Defendants respectively), voted to file for Chapter 11 bankruptcy on behalf of BML. The Chapter 11 proceedings were subsequently dismissed in favor of winding-up proceedings in the Bahamas. In those winding-up proceedings, CEXIM, BMLP's lender, took control of BMLP's shares in BML, forcing BMLP out of the Project, resulting in the total loss of its investment. The Bahamian court approved the sale of the Project to Perfect Luck Assets, Ltd. (Perfect Luck), a Chinese company and subsidiary of CEXIM, and CEXIM remained the financier of the [*5]Project. In connection with the wind-up proceedings, certain agreements were entered into between Perfect Luck, BML, and the Defendants, including Amendment No. 9 (NYSCEF Doc. No. 521), the Deed of Release (NYSCEF Doc. No. 531), and the Deed of Novation (NYSCEF Doc. No. 532). Among other things, these agreements and the wind-up proceedings resulted in the release of claims by BML (which BMLP was no longer a part of having been wiped out) and by Perfect Luck against the Defendants in connection with the Project. Perfect Luck subsequently sold the Project to another Chinese Company, Chow Tai Fook, who retained CCA as construction manager, ultimately paying over $700 million to complete the Project, which finally opened in April 2017.
 Discussion
On a motion for summary judgment, the movant must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Failure to make such a showing requires denial of the motion regardless of the sufficiency of the opposing papers (id.). Upon such a showing, the burden shifts to the party opposing the motion to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact requiring trial (id.).
I. The Defendants' motion (Mtn. Seq. No. 012) must be denied
As an initial matter, several arguments advanced by the Defendants in support of summary judgment have been heard and rejected in the Prior Decision and by the Appellate Division. Discovery has not provided a factual basis for a different conclusion. The Court notes that inasmuch as BMLP has withdrawn their claims with respect to the November 2014 Meeting Minutes, these claims are dismissed.
a. The Claims Are Direct Not Derivative
The Defendants argue that they are entitled to dismissal because these claims are derivative and not direct claims. They are not correct. Discovery confirmed that BMLP sustained a disproportionate loss (SFR Holdings Ltd. v Rice, 132 AD3d 424, 425 [1st Dept 2015]) and that its losses stem from various breaches of duty and contract that the Defendants owed to BMLP. BMLP lost its entire investment, which David Bones, BMLP's expert, estimates to total $830 million in tangible and intangible assets, including land and leased facilities, improvements, personal property, contracts, approvals, hotel assets, intellectual property, intangible personal property, casino operations and license, and cash (NYSCEF Doc. No. 620, at 9). The Defendants, by contrast, made over $700 million (NYSCEF Doc. No. 619, at 3).
b. The Fraud Claims are Not Duplicative and Issues of Fact Remain as to Whether BLMP's Reliance was Reasonable
The Defendants argue that all claims for (i) failure to properly report progress on the Project, and (ii) fraud arise from the Investors Agreement and that therefore the fraud claims [*6]must be dismissed as duplicative of the breach of contract claims. This is also not right.
The fraud claims are predicated on certain affirmative misrepresentations unrelated to the Investors Agreement made by the Defendants, including, among other things, (i) representing that there was sufficient labor and resources to complete the Project on time when in fact workers were being taken off of the Project, and (ii) asking for additional money to pay subcontractors and then using such money for other purposes having nothing to do with the Contract (e.g., acquiring a Hilton just down the road (NYSCEF Doc. No. 605, ¶¶ 22-40). As such, the fraud claim is not duplicative of the breach of contract claim.
As a fallback position, the Defendants then argue that the fraud claim should be dismissed because BMLP did not actually or justifiably rely on any alleged misstatements or omissions. This argument also fails. Issues of fact for trial prevent the dismissal of BLMP's fraud claims. For example, it is unclear whether the Defendants (i) concealed the workforce participation at the Project from BMLP (NYSCEF Doc. Nos. 595-596), (ii) requested funds through an Emergency Utilization Request to pay subcontractors for work for the Project but did not use those funds to pay subcontractors or advance the Project (NYSCEF Doc. No. 605, ¶¶ 29-54), and (iii) told BMLP that they had a plan to substantially complete the Project by the middle of February 2017 when they in fact did not (NYSCEF Doc. No. 624). It simply is not clear whether BMLP reasonably relied on these representations by proceeding with the plans given to them and making the payments that they made.
c. BMLP is not precluded by the Investors Agreement from seeking Lost Profits
Lost profits are recoverable as direct, not consequential, damages when they (i) were within the contemplation of the parties at the time the agreement was entered into, and (ii) are capable of measurement with reasonable certainty (Biotronik A.G. v Conor Medsystems Ireland, Ltd., 22 NY3d 799, 806 [2014]).
The Defendants argue that pursuant to Section 11.10 of the Investor Agreement, the parties agreed that consequential damages are not available and that as such BMLP may not seek lost profits. Relying on Kenford Co. v County of Erie, 67 NY2d 257 (2014) and Bersin Props., LLC v Nomura Credit & Capital, Inc., 74 Misc 3d 1209(A) (Sup Ct, NY County 2022), the Defendants also argue that BMLP should not be permitted to seek lost profits because lost profits are too speculative and were not in the contemplation of the parties at the time the Investors Agreement was executed. In particular, they argue that lost profits are speculative because there is no historical data for earnings generated by the Project, such that any proposed calculation can not be reasonably certain.
In Kenford, the County of Erie entered into a contract with the plaintiffs for the construction and operation of a domed stadium facility near the City of Buffalo. This was a new business venture in an untested market. The parties' contract provided that construction would begin within 12 months of the contract date, that the parties would negotiate a mutually acceptable 40-year lease, and that, if the parties could not agree on a lease within three months, a separate management contract would be executed. The parties never agreed on the terms of the lease and construction did not begin within the one-year period. At trial, the jury awarded a verdict in the plaintiffs' favor, including an award of lost profits. The Appellate Division reversed the judgment for lost profits and certain out-of-pocket expenses and directed a new trial on other issues. The Court of Appeals affirmed holding that lost profits over a 20-year period [*7]was not within the contemplation of the parties at the time the contract was executed or breached and that the experts' projections of lost profits assumed that the facility was completed, available for use, and successfully operated for 20 years, which was too speculative under the circumstances.
Bersin involved a $135 million loan to renovate, redevelop, and re-lease a shopping mall in Rochester, New York. The loan agreement provided for a two-year term with an option to extend for three successive one-year periods, if certain requirements were met, including that, at least ten business days prior to the start of an extension period, the plaintiff deliver an interest rate cap agreement (IRCA). In 2009, the plaintiff sought to extend the term of the loan but was not able to timely procure and submit the IRCA. Subsequently, on the final day of the term of the loan, the plaintiff sought to make a $54 million draw down which the defendant lender rejected ultimately calling the loan in default. The plaintiff sued, alleging breach of contract for failure to extend the term of the loan and failure to honor the $54 million draw and otherwise sought lost profits. The court (Reed, J.) awarded summary judgment to the defendant and dismissed the plaintiff's claims for lost profits because (i) lost profits were not contemplated by the parties at the time they entered into the loan agreement, and (ii) the plaintiff's lost profits were due to its own failure to satisfy the requirements of the loan agreement in failing to obtain the IRCA. 
As BMLP's papers make clear, neither Kenford nor Bersin mandate the result urged by the Defendants. Relying on IS Chrystie Mgt. LLC v ADP, LLC, 205 AD3d 418 (1st Dept 2022), Ashland Mgt. v Janien, 82 NY2d 395 (1993), and Electron Trading, LLC v Morgan Stanley & Co. LLC, 157 AD3d 579 (1st Dept 2018), BMLP argues that lost profits here are direct, not consequential damages, because they were in the contemplation of the parties at the time they entered into the Investors Agreement and because they can be measured with reasonable certainty. In particular, BMLP argues that they were within the contemplation of the parties because the purpose of the Investors Agreement was to complete and run the Project, i.e., profits from the resort was the entire purpose of the Project. Among other things, BMLP adduces an investor deck which predates the Defendants' involvement in the Project and sets forth certain expected profits based on existing established comparable hotels in the Bahamas (NYSCEF Doc. No. 623). They also argue that there is sufficient data from similar resorts both in the Bahamas and elsewhere to make the amount of lost profits calculable with reasonable certainty. BMLP also argues that, even if the Court were to find that lost profits are consequential damages, the limitation on seeking such damages should be struck due to the Defendants' wrongdoing.
IS Chrystie involved a master services agreement pursuant to which the defendant in that case was retained to provide payroll services to the plaintiff. The agreement capped direct damages available to the plaintiff, other than for willful, criminal, or fraudulent conduct, and barred consequential damages. The trial court denied summary judgment, finding issues of fact as to whether the defendant's conduct qualified as willful misconduct. The Appellate Division affirmed the denial of summary judgment, finding that determining whether lost profits are direct or consequential is a case-specific approach requiring the court to look at the contract in its entirety. This is certainly the case here where it appears that the parties full well understood the prospective profits of the Project.
In Ashland, an employee of an investment management firm developed a mathematical model for determining investment strategy and sought to sell it to the firm. A dispute arose, and the firm sued the employee to prevent him from using his model, alleging that it was based upon [*8]trade secrets that he had misappropriated from the firm. After a bench trial, the trial court found that the parties had formed a contract and that the plaintiff had breached it. The court awarded the defendant damages for lost profits holding that lost profits were within the contemplation of the parties at the time the contract was entered into and held that the information available to the defendant did not constitute a trade secret. The Appellate Division affirmed on this ground. The Court of Appeals also affirmed the lost profits holding because it was clear that lost profits were within the contemplation of the parties. The Court of Appeals also found that the projection of future profits was not speculative because (i) this new strategy was not a new or unfamiliar business, (ii) the parties' relied on their carefully studied professional judgments, (iii) the fund already had a base of customers to whom it could market the model, and (iv) the model had been back-tested prior to commercial use. In so holding, the Court of Appeals distinguished the case from Kenford noting that the successful operating of the stadium was overly speculative.
In Electron, the plaintiff, a developer of intellectual property relating to electronic securities trading, entered into two agreements with the defendant, one granting the defendant exclusive license for its alternative trading system, and one whereby it agreed to provide consulting services. The defendant agreed to use commercially reasonable efforts to develop and implement software and systems to operate, market, and launch the plaintiff's alternative trading system. It was undisputed that the defendant failed to do so. The defendant agreed to pay any damages due under the agreement's limitation of liability provision, but the plaintiff contended that the defendant's wrongdoing was sufficient to render the limitation of liability provision unenforceable. The Appellate Division, noting that such limitations are unenforceable where there is misconduct involving fraudulent, malicious, sinister actions of bad faith or in cases of gross negligence unrelated to any legitimate economic self-interest, nonetheless found that the limitation of liability provision was enforceable because, at worst, the defendant's conduct as alleged constituted intentional breach.
This case involves a joint venture specifically formed for the purpose of developing a hotel in an established market where the profits of comparable hotels were known and considered in moving forward with the Project such that it can not be said that profits were either outside the scope of the contract or too speculative. Accordingly, summary judgment and dismissal is not appropriate. Indeed, as early as April 2008, there appear to be investor decks reflecting projected earnings for the Project based on other established successful hotels in the same market (see NYSCEF Doc. No. 623). These materials were undoubtedly available to the Defendants as part of their diligence review in entering into the Investors Agreement and these known comps form the basis for David Bones' expert report (NYSCEF Doc. No. 620). Put another way, this case does not involve a stadium in an untested market or a tangential loan where the plaintiff failed to meet certain funding requirements for an extension of the loan. Thus, the defendants are not entitled to dismissal of the claims seeking lost profits at this stage. For the avoidance of doubt, at trial, BMLP bears the burden of demonstrating the understanding and expectations of the parties with respect to such lost profits. 
d. The Defendants are not entitled to judgment that they did not breach Section 4.7 of the Investors Agreement
The Defendants are also not entitled to summary judgment that they did not breach Section 4.7 of the Investors Agreement. As discussed above, the CSCEC Representatives had an [*9]obligation to act in the best interest of BML. On the record before the Court, this they did not do. Contrary to the Defendants' arguments, it does not matter that the CSCEC Representatives "wore different hats" in their different roles for different parties, when they changed their hats, they could not simply shed their responsibilities. 
e. The Defendants are not entitled to judgment (i) that BMLP's claims were released in the wind-up proceedings, or (ii) dismissing the claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing
BMLP's claims were not released as part of the winding-up proceeding in the Bahamas because BMLP was not part of that proceeding and the Bahamian court did not consider BMLP's claims. Amendment No. 9, the Deed of Release, and the Deed of Novation similarly do not release BMLP's claims because BMLP was not a party to those documents. The claims released under those documents were released only by BML and Perfect Luck. 
The Defendants are also not entitled to dismissal of BMLP's claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing. The unjust enrichment claims arise from the Defendants' alleged efforts to remove BMLP from the Project and have BMLP replaced by Perfect Luck while continuing to receive payments from BMLP. The breach of the implied covenant claims, pled in the alternative, arise from the Defendants' bad faith efforts to extort or fraudulently obtain extra funds from BMLP that were not used to further the Project. Thus, the Defendants' motion must be denied in its entirety.
II. BMLP's motion (Mtn. Seq. No. 013) for summary judgment must be granted
BMLP argues that it is entitled to summary judgment dismissal of CSCE's counterclaim that it breached Sections 4.7, 4.8(g), and 4.8(l) of the Investors Agreement because it did not breach those Sections of the Investors Agreement and, even if it had, any alleged breach did not cause CSCEC damages. BMLP also argues it is entitled to summary judgment dismissal of the Defendants affirmative defense that its claims are derivative and not direct. Additionally, BMLP argues that it is entitled to summary judgment dismissal of the affirmative defenses that BMLP's claims were released pursuant to (i) BML's winding-up proceedings in the Bahamas, (ii) the Deed of Novation, and (iii) the Deed of Release because BMLP had been forced out of the Project by the time the proceedings occurred and the deeds were executed. BMLP also argues that the affirmative defense that BMLP's claims are subject to liquidated damages fails because the Defendants do not identify what claims are subject to liquidated damages and such limitation could only arise under the MCC, which is not at issue in this case. BMLP argues that it is also entitled to dismissal of the affirmative defense that the claims are barred by the statute of limitations because this case was timely filed. Finally, BMLP argues that the affirmative defense for failure to join a necessary party fails because all necessary parties have been joined. 
The Defendants argue among other things that disputed issues of fact remain as to whether the BMLP breached the Investors Agreement. They argue that there is an issue of fact as to (i) whether BMLP withheld books and records from the CSCEC Representatives, (ii) whether BMLP filed Chapter 11 bankruptcy in violation of Section 4.8(g) of the Investors Agreement, and (iii) whether BMLP obtaining a loan violated Section 4.8(l) of the Investors Agreement. They also argue that there are issues of fact as to whether these alleged breaches [*10]caused damages to the Defendants.
As discussed more specifically below, the Defendants are not correct. For completeness, the Defendants withdrew their affirmative defenses that (i) the claims are subject to liquidated damages, (ii) the claims are barred by the statute of limitations, and (iii) BMLP failed to join a necessary party.
a. BMLP is entitled to judgment that it did not breach Sections 4.7, 4.8(g), and 4.8(l) of the Investors Agreement
The record is bereft of any evidence supporting the claim that BMLP breached Sections 4.7, 4.8(g), and 4.8(l) of the Investors Agreement. More specifically, although CSCEC argues that it was not given access to material information as required under Section 4.7 of the Investors Agreement, there simply is not a single example in the record of a request for access that was denied. For completeness, it is simply false that the Defendants did not know Mace was BML's owner representative. The record reflects daily interactions with Mace (tr at 64, lines 4-16 [NYSCEF Doc. No. 523]). The Defendants also allege that BMLP breached Section 4.7 by not providing, among other things, agreements and communications, a budgetary analysis, and a guarantee to process outstanding change orders, in connection with a request by BMLP for CSCEC to contribute an additional $15 million. This argument fails. Nothing in Section 4.7 requires the creation of documents or the guarantee of payment. In any event, the request for contribution was made pursuant to a Sponsor Support Agreement, not the Investors Agreement (NYSCEF Doc. Nos. 525-526). Lastly, the Court notes that to the extent CSCEC argues that BMLP breached Section 4.7 of the Investors Agreement by refusing to second certain proposed CAA representatives to the Project, that theory is advanced for the first time in opposition to the motion for summary judgment and is therefore waived. Thus, the Defendants' claims based on Section 4.7 must be dismissed.
CSCEC argues that BMLP breached Section 4.8(g) of the Investors Agreement by causing BML to file for Chapter 11 without the Defendants' consent. The problem however is that Luming (Lawrence) Gao, CSCEC's representative was unable to identify any damages stemming from this alleged breach and instead only indicated that damages were demonstrated by looking at the Investors Agreement (tr at 20-23, lines 17-17 [NYSCEF Doc. No. 529]). This is plainly insufficient to create an issue of fact for trial. For the avoidance of doubt, the Defendants' argument that they are entitled to damages because BML's soft cost expenditures were excessive is belied by the report of Ernst & Young finding that the majority of invoices audited were complete and accurate and that the BML soft cost budget was reasonable and appropriate (NYSCEF Doc. No. 639, at 2-3, 5). Nor is the Chapter 11 proceeding a sufficient basis for damages, because the Bankruptcy Court specifically found that BML's filing of Chapter 11 was done in the best interests of all stakeholders, including the Defendants (NSYCEF Doc. No. 528, at 15). Based on this finding there can be no damages and, absent damages, there is no issue for trial. 
Finally, the Defendants argue that BMLP breached Section 4.8(l) of the Investors Agreement by causing BML to procure a loan outside of the regular course of business. However, the record facts establish that the loan was both (i) necessary to continue the ordinary course of business and (ii) on terms favorable to BML because, among other things, (w) the interest was payable in kind, (x) there was no pre-payment penalty, (y) BML could avail itself of [*11]better financing without penalty if another lender emerged, and (z) the term of the loan was sufficient to allow restructuring of business while in Chapter 11 (NYSCEF Doc. No. 519). The loan came just days after the BML Board discussed at a June 24, 2015 meeting that BML's financial situation was worsening (NYSCEF Doc. No. 524). CSCEC's counterclaim for breach of Sections 4.7, 4.8(g), and 4.8(l) of the Investors Agreement must be dismissed.
b. BMLP is entitled to judgment dismissing the Defendants' affirmative defenses that BMLP's claims are (i) derivative, or (ii) released by the wind-up proceedings
For the reasons discussed above, the affirmative defense that (i) BMLP's claims are derivative is (ii) that BMLP's claims are released pursuant to the winding-up proceedings or pursuant to the Deed of Novation and Deed of Release must be dismissed.
The Court has considered the Defendants' remaining arguments and finds them unavailing.
It is hereby ORDERED that the Defendants' motion for summary judgment is denied; and it is further
ORDERED that BMLP's motion for summary judgment is granted; and it is further
ORDERED that the parties shall appear for a pre-trial conference on June 14, 2023, at 12:30pm.
DATE 5/25/2023
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1: In the Investors Agreement, CSCEC is referred to as "China State".